The Illinois County Court and our division is now in session. The Honorable Justice Jesse G. Reyes is presiding. Good morning everyone. Good morning. You can have a seat. Morrows v. Magellan Parcel. Would the counselors who are going to argue in this manner please step forward and come up to the podium please. Could you state your names for the record and what party you are representing? Adam Goodman, G-O-O-D-M-A-N for the Appellant Barrows, LLC. Good morning, George Bathurst on behalf of Magellan Parcel, C-A-X-D-L-L-C. Okay. I'm sorry? The Appellee. Okay, great. Thank you. All right. And just as a reminder, the microphone doesn't amplify. It's only for recording purposes. So if you could keep your voice up loud and clear so they can pick it up, okay? And then time for rebuttal? Certainly. How much? Four minutes. Four minutes. All right. Okay. Ready to proceed? Yes. All right. Can I ask one thing though? Your voices are not carrying, so please raise your voices. You're going to be the first person who ever said my voice didn't carry. I promise you I will not. Okay, good. People tell me I talk too loud, but I want everybody to hear. May it please the Court. Barrows asks you to reverse the trial court. The trial judge erred in granting Magellan 615 motion because the amended complaint states a claim. The central premise of Barrows' argument is that being on standby, which we sometimes refer to in our briefs and is sometimes referred to in the case law as access, is a service. It's something of value. And it is not Barrows' fault or responsibility that Magellan did not choose to take advantage of its access to Barrows' advice. After all, Magellan is a pretty well-known and substantial landlord in this town. Its buildings dot the skyline. Apartments, condominiums, there's commercial or office space in some of them, I'm sure. Magellan would undoubtedly, vigorously, perhaps even violently resist the suggestion that its tenants did not need to pay rent if its tenants chose not, for whatever reason, to take advantage of the leases that they had signed and their access to the rental properties. I have a question. What is the connection or the relationship between Mr. Ochsner and Barrows LLC? Because in the briefs, it seems like they're interchangeable. At one time, it seemed like they were working for one side and then they become advisors in this manner. And then in the briefs, it's a little confusing in terms of the relationship because it's so interchangeable. Mr. Ochsner is the managing member of Barrows LLC. Barrows LLC is a Delaware limited liability company. Mr. Ochsner was previously, or concurrently, was also the managing member of Campanile, another limited liability company. Mr. Ochsner and Mr. Hua and Campanile were retained by WANDA to assist WANDA with regard to trying to get out of U.S. real estate investments. What's now the St. Regis here in Chicago, as well as a vacant lot in Beverly Hills, California. And Mr. Hua and Mr. Ochsner and associates or assistants and Campanile provided several thousand hours worth of assistance to WANDA. And then that was with regard that sort of culminated in a victory deal, which is alleged in the complaint. And what is victory here? Victory is a pseudonym. Let me stop you for a second because I thought victory didn't buy the property. They did not. I thought you said it culminated in a deal with victory. No. Think of it as a winnowing process, Your Honor. There were 20 or 30 people who were contacted to explore their interests. Some of them were interested and some of them weren't. It's sort of victory was the potential buyer that got the furthest. Victory is a pseudonym for a company that everybody knows the identity of the company. But because there are confidentiality agreements and so forth, we're protecting the identity of the company. So Mr. Ochsner and Mr. Hua worked with WANDA and victory and Magellan, because Magellan was the minority owner or partner or partial owner of this, on the victory transaction. Among other things, they worked with Chase Bank, which was to be the lender for the victory transaction. They worked with the St. Regis Hotel, which was to be the hotel brand for the victory transaction. The victory transaction founded because victory and Magellan couldn't get along, as it is alleged, and also because victory couldn't or wouldn't meet Magellan's price. Can I stop you for one second? Sure. Because you're saying, I'm not going to say their names because I can't remember, but Mr. O and Mr. H. Okay. And Campanelli did all this work. You don't say anything about barrels doing any of this prior work. This is all prequel or back on information. This is all before barrels. Right. Right. And recall that Judge Roberts dismissed the complaint and ordered us to file a more detailed complaint. So without regard to whether barrels felt this information was necessary, we added additional information in an attempt to satisfy what Judge Roberts had said. So getting back to my original question, what it was was, maybe I wasn't clear, what's the connection between Oxner and barrels? And you're trying to lay out a foundation here for us so we could understand, but for our purposes today, regarding the issues that are before us today, what was that connection between the two? Oxner owns barrels. There may be other minority owners, but Oxner runs and owns barrels. Okay. Is the same the case for Campanelli? Campanelli, yes. Oxner also runs and owns Campanelli. Again, there may be minority owners, but for all practical purposes, he is the managing member of both entities. I'm sorry, are you saying like Oxner provided services or just let himself stay open for access to services as defined in the agreement? After the advisory services agreement that's attached to the complaints here was signed, barrels, Oxner, Kua were on standby. They were available. They were continuously available to Magellan to assist Magellan in whatever way they saw fit. So you're in agreement that they were on standby and did not affirmatively provide services? Or are you saying standby is a service? It doesn't matter. Standby is a service. In order to effectively provide standby, one has to continually update oneself about what's going on with the transaction. But did they regularly take meetings with Magellan? Did they regularly write to or call Magellan and give them advice? We don't allege that, and we don't believe that it happened. Now, you're referring to Oxner right now when you say date, right? Oxner, Kua, barrels. Okay. That's the advisory services agreement. So this ASA, it says in there the agreement embodies the entire understanding of the parties and supersedes the prior communications, et cetera. So if this is sort of a standby agreement, wouldn't we expect to see some wording of it in here that we're on standby? Or we're just here in case you need advice? Well, because services is defined, the company engages advisor to assist the company in acquiring WANDA's ownership interest in the project. The services to be rendered by advisor pursuant to this section shall be referred to herein as the services in bold and italics. Correct. So that's the definition of services according to the agreement. Right. And assistance is frequently consists of being on standby or standing around waiting. In order to effectively be on standby, one has to apprise oneself of what's going on. So they did do work after the advisory services agreement was signed. I thought there was an admission that there was no actual work done. No. Wait, wait, can I get that answer first? Because you just said that they did work. I thought there was an admission that there was no work done. And you were relying basically on the work that the C Company, Camp Company did, the thousand hours and the agreement with Magellan and WANDA that Magellan would take on this prior work of Campanelli unrelated to Barrow. That's not entirely true. In a broad brush way, like one imagines painting with a roller, that's true. But if you look at paragraph 19 of the amended complaint, paragraph 19 of the amended complaint alleges that Barrow's second sentence, Barrow's check with Magellan regarding the status of the project was told to remain on standby. Barrow's was also communicating with Dowell and WANDA during the term of its Magellan agreement, engagement, I'm sorry. So those two sentences allege actual work that was done. Now, we contend for a variety of reasons that no actual work was necessary, that no actual work was contemplated, and or that we get credit for the work that was done by Campanelli, the 2,000 hours prior to the engagement. But if the Court agrees with the sentiment that underlying Judge Roberts' decision that work actually needed to be provided post-agreement, those two sentences of paragraph 19 allege forms of work that were provided post-agreement. And therein lies the difficulty, which is that there is nothing, Justice Antonio pointed to the crucial language in the agreement, there is nothing else in the agreement that provides any metric for assessing how much quantitative work would be necessary or who is in charge of weighing or measuring or assessing that quantitative work. The compensation arrangements here are entirely contingent, entirely contingent. And on demand, it would be our burden to demonstrate, were we to move for summary judgment or to demonstrate a trial, that the contingency was satisfied. In other words, that the discount was obtained. Okay? So the compensation here and the agreement is coupled entirely, is pinned entirely on the results that are obtained. And in that way, it is analogous to the brokerage cases. We cite in our appellate brief cases from both this Court, the Seventh Circuit, elsewhere, saying that an exclusive brokerage agreement qualifies a real estate broker for commission, even if the real estate broker played no role in actually selling the property. Let me ask you this. Bottom line, what type of services did Barrows provide to Magellan besides standing by and waiting? What specific services did Barrows provide to Magellan? Well, Barrows also kept itself updated. This is the two sentences I pointed to. Other than being updated and standing by, what else did they do? What specifically? And you point to say, okay, they did this and that. Well, if you mean, did they, you know, edit documents or did they... What was the exact nature of their services? Let me put it that way. They were available at all times to Magellan to give them advice and to Magellan and Dali and Wanda Group to serve as an intermediary between the two. And their presence as Magellan's advisor and their presence as a potential intermediary between Dali and Wanda and Magellan was requested, it is alleged, by Dali and Wanda. And Dali and Wanda desired that Magellan pay for this. And that is also alleged in the amendment complaint. And the inference that had, that if one couples Dali and Wanda's desire that Barrows be paid with Dali and Wanda's desire in the party's agreement that Magellan would pay Dali and Wanda, I mean, excuse me, Magellan would pay Barrows if the contingency was satisfied. So just to answer my question is that there's not, other than just waiting, like someone waiting as a chauffeur waiting for somebody, is there anything that you could point to that say that they physically did some type of service, reviewed documents or... In the following sense. The chauffeur, while he or she is sitting in the vehicle and the vehicle is outside the building and it's filled with gas and so forth, the chauffeur doesn't have to do anything other than wait. But there is an opportunity cost in the sense that if the chauffeur can only wait for one person or one group of people outside one building. And therefore, by waiting for one person or one group of people, they cannot take rides or offer rides to others. This is a little different. For professional services or consulting services, you can have multiple clients at a time. But being on standby for one client or for even several clients reduces one's ability to take on other work. But there is one other facet to it that's crucial, which is that consultants, attorneys, accountants, whomever, professional service providers who are on standby, have to continually do work to enable themselves to go on if they're called upon. They have to be continually familiar with the facts of the transaction, the personnel involved in the transaction, the parties to the transaction, any developments in the broader society. This is during a time of substantial uncertainty in world affairs. The period during which this contract was enforced was the first year of the coronavirus. That had resulted in tremendous economic uncertainty about interest rates, unemployment, the fate of the global economy, demand for luxury condominiums, demand for luxury hotel rooms, whether business travel was ever going to recover, whether leisure travel was ever going to recover, whether we'd be wearing masks the rest of our lives. That you're going on about non-issues. I disagree. Well, I know you do, obviously. In order to provide decent advice, if and when one is called upon, one has to stay up-to-date on changes such as the changes in the broader society, interest rate changes, personnel changes and so forth. And that's work. If you don't mind interrupting. So in the amended complaint, there's a reference to Chinese custom. And in the record, there doesn't appear to be any reference to Chinese custom prior to the amended complaint, which means that when there was agreement was entered into by the parties involved in this transaction or undertaking, there's no reference to the Chinese custom. And then all of a sudden it appears in the amended complaint. So is there a reference anywhere else? Maybe I missed it, but is there a reference anywhere else about the Chinese custom other than in the amended complaint? Other than not verbal. I will acknowledge there's no reference to Chinese custom in the advisory services. To be honest, I don't remember whether there is a reference to Chinese custom in the original complaint. There is or there isn't. They're very short pleadings. You know, there is or there isn't. We're not placing any significant reliance on Chinese custom. That's just an example of the sort of background detail that Judge Roberts requested when she asked us to amend the complaint. So is it your position the Chinese custom isn't really relevant to the 2615 motion to dismiss ruling and the basis for it? It might be a dot in a sort of point to list, you know, along with numerous other factors, but it is not in and of itself significant. Then why place it in the amended complaint? Because the trial judge said in her order dismissing the original complaint that she thought we needed to provide more factual information. So we provided more factual information. That does not mean that our client or counsel felt that that information was all necessarily relevant. Judges, your Honor, trial judge for a number of years, the trial judge asks you to shape your pleadings in a certain way. You do your best to try and accommodate him or her. Because he's just discounted the Chinese information, no. Because I was going to address the integration clause, but you've just taken that issue out of my consideration. All right. Okay. Can you sum up? You still have time for rebuttal. Certainly. Barrows would respectfully suggest that the trial court erred in determining that Barrows had to do anything in particular. The real estate broker cases ought to control here, as well as the analogy to the letter of credit and the notion that people constantly pay for access, including constantly paying very large sums of money for access, access to space, access to expertise, access to a wide variety of things. Whether the contingency came to pass can and undoubtedly will be the subject of discovery and trial on remand. But it states a claim to allege that you entered into an agreement to provide somebody access to your services. You don't use the word access, though, so. In your, all right. You say to assist them in acquiring. And there are services to be rendered in that regard, to be different places in it. Well, paragraph 19 again says Barrows provided the contracted for services in assisting Magellan in acquiring Wanda's share of the project. And then the second and third sentences describe checking in, being on standby, and communicating and being continually available to assist. And I would respectfully suggest that the phrase continually available to assist is synonymous with access. I'm talking about the contract, the words of the contract, not what you wrote in the complaint. Your contract says to assist them in acquiring Wanda's ownership interests and those services to be rendered by them will do this and the services to be rendered will do that. That's correct. Our theory and our allegations are that the assistance was being available. The assistance was being on standby. The assistance was continually educating ourselves or staying in contact with others such that we could provide the services when and if called upon to do so in a period of tremendous, perhaps unprecedented change and flux in the economy and the financing and real estate markets in the perceived need for apartments, condominiums, hotels, and so forth. I will reserve the balance of my time for that. Thank you. May it please the Court. I'll start with you. I have a question at the fore. Of course. Was the agreement between Barrows an enforceable contract? Yes. How so? It is an executed and written agreement. It's contemplated performance, signed by both parties. Consideration was in the nature of promise. If you put in consideration of services provided to the extent we get a discount and you have assisted us in getting that discount, we promise to pay you. There is consideration. If both parties here define the scope of services, would them be green? The parties, so there's nothing in it that says here's exactly what assistance will look like, right? But again, when you begin this process, you don't necessarily know what you will need. So, you know, I signed a contract to, well, no, that's a bad example. In a contract where they have said, again, you look at the recitals. It says the advisor has certain experience with arranging and facilitating such transactions. Okay. The company engages the advisor to assist the company in acquiring the ownership interest. Those services to be rendered will put them eligible to be paid if there's a deal. Again, this isn't about, this case is not about whether the services were actually performed competently or whether the services actually assisted. Their papers, their brief, their brief before you says, okay, you got us. We didn't do anything. They talk in their briefs, in their papers about Chinese customs. And it's not in the first complaint at all. Basically saying, look, it's Chinese custom that the broker gets paid. We shouldn't have to do anything. But now they're saying it's irrelevant. The Chinese customs are irrelevant. Well, again, I wish I hadn't had to brief all that issue. But, again, my biggest issue is this just shifting back and forth. Now, the brief talks about, well, the court erred because they talked about services. They just ignored the assistance. Advisory services is assistance. If you provide assistance, you're providing the advisory services. That's like hair splitting on an elite Nobel Prize level. This is pretty simple, right? You've got the skill. We've asked. If you provide assistance to us, great. You might get paid if we get a discount. We didn't get a discount neither here nor there. The fact is nobody just said sit out there. We asked for assistance. They didn't ever look at this as an assistance. They told you. We thought we were going to get paid just because of Chinese custom. The only work that they talk about was not work to be provided. It was provided in the past to Victory and to Wanda. They didn't provide services to Magellan. And then he talks about, well, they had to prepare themselves, and he talks about the analogy of a lawyer who has to prepare themselves. I read up on cases that you decide, that the Supreme Court decides, that the Seventh Circuit decides. I try to make myself knowledgeable so that I can assist my clients. I don't bill my clients for making myself conscious of what's going on. So what specifically was your client expecting Barrows to do? Again, he told you when he got up here. This was something Wanda wanted. This was not something that Magellan wanted or asked for. But if they provided services, right, they came in and led the negotiations, rolled up their sleeves, took the lead on anything, then argued, then clearly they would have been in a position. They didn't. They didn't insist on providing services. We didn't ask them to provide services. We didn't need them, did the deal entirely again. And why would you need a contract? This was, do you want me to tell you what I believe happened? Yeah. So I think this was a kickback. I think Wanda, the person who was initially negotiating with Wanda, and this is in Mr. Carlin's affidavit, which is part of the record, which they didn't, the person who was leading the negotiations for Wanda saw an opportunity to perhaps line his own pocket. He made us do this deal with this guy. That's why they said we didn't think we'd have to do anything, and he was going to take that money. He got fired. Four months go by. Somebody else comes in. They don't even show up at the table. They don't show up at the table. They didn't know this deal was done until they read about it in the paper. Talk about a disconnect. They did provide services. They did. Simple as that. What about the issue that they were on standby? Standby isn't services provided. Standby is not assistance. Is that in the contract, though? No, it's not in the contract. It doesn't say that just being ready. It says you will provide us assistance. Assistance is not being ready, right? That's your obligation as a professional to make yourself ready. Assistance is spending time, exerting effort to advance the negotiations directly, not to be ready just in case I'm called upon. That's their inherent duty. My duty as a lawyer is to be ready to understand the law. I don't bill my clients for learning about the law, not unless they ask me to learn about a specific thing. If I want to be paid for my just general skills and availability, I sign a retainer agreement with them that requires them to pay me a certain amount a month, and then they get my time and they get my expertise. But otherwise, I do services. I perform work before I send them a bill, certainly for a $7 million bill. This is, again, the fact that it started as, hey, we just performed services, and the judge said, that's not facts. That's just a conclusory statement. Well, fine, we didn't really perform services, but it's Chinese custom. And then they put that in their brief, in their appellate briefing from you, and now they're abandoning it. They're saying, well, we were on standby. Standby is not services. Standby is just being a professional. Look, it doesn't say, they kept saying in their brief, kept saying in their brief, there was an expectation that if this deal closed, we would get services. No, that's not what it says. The contract plain as day says, in consideration of the services to be rendered, you get paid, right? They never performed those services. And to her great credit, Judge Bynum said, I've seen enough of this, right? Listen, I've done this long enough to see a shakedown when I, to know a shakedown when I see it, and this is, that's all this was, and I give her credit, right? This is not, this is not something where we need to dig in and look at the facts. This is a nonsensical construction of this contract. If, if it was ever, I don't have to do anything in order to get paid, there wouldn't be mutual termination provision. You're essentially reading that provision out of the contract. If it was, we don't have to do anything to get paid, then there's no mutuality of obligation. It required them to do, it's not an unenforceable contract. She didn't find it's unenforceable. She found that they didn't perform the services, which is a prerequisite for stating a claim for breach of contract. She was right. She was absolutely right. If bonus was to be paid for services, then why did the agreement also refer to success fee? Well, this is, yeah. Wasn't that based on the successful transaction? No, the success, the success would be that you get a discount, right? I firmly, again, going back to what I believe really happened, Magellan said, I don't know if Mr. Carlin understood at the time that this was a kickback thing, but ultimately he was told, look, you won't have to pay them unless they help, and you actually get a discount. And I guess from Mr. Carlin's perspective, as long as I get a discount and only have to pay some of that discount, and I can terminate, okay, fine. But again, it doesn't say if you want, if you want. Like, for instance, he talks about a brokerage agreement, a real estate brokerage agreement. Those listing agreements will say, hey, during the time of the listing, I get credit. It says it in the contract. I get credit regardless if I showed the property or not, right? And then sometimes there's even kickers that say if the, if the, if somebody comes back and I showed them, that's not what this agreement says. It doesn't create this you get paid if you don't do services. So the success fee is if we get a deal that saves us money, and it didn't, but that's not, that's not the issue before this Court, then you're entitled to a fee. The contract's enforceable. It just didn't perform and not entitled to anything. I will happily address any other questions you have, but I think the papers, I think, I think counsel's admissions today speak for themselves. Judge Brennan did not err. Judge Brennan was 100% correct to dismiss this with prejudice. They admitted they did not provide service. It was correct for her to put this case to an end. Her dismissal with prejudice should be affirmed. So the dismissal that you pursued was under 2615. Correct. Then should we consider McJohn's alleged termination of the agreement? I, I, you certainly can, and I think you should. I put that in the papers. You haven't asked about it. I'm happy to address it. I think I still have time. Yes. Again, this is one where, this is what the contract, this is what they agreed in. It wasn't just our right to terminate. It was their right to terminate as well. And that, that is plain as day. And, again, we get a call after, after we sign the deal, after it goes public, we get a call congratulating us. And, and Mr., well, at that point, there was nothing left to do. So, for clarity, he said, well, thank you. We, we took care of everything ourselves. Your services are not needed. Now, at that point, it's also clear that from Mr. Carlin's perspective, they didn't get a discount. And, and he's detailed that in his declaration exactly why. I mean, bottom line is, it, it cost us more money to do this deal, but that, that's what he chose to do. There wasn't a discount. And so the idea that he just wanted to make that clear, that we weren't going to, we don't think we're owing you anything, but we'll, we'll take it from here. That's what that was about. That was his contract right. You, you can talk about the, the good faith and fair dealing, but you're talking about sophisticated, super sophisticated parties talking about a potentially multi-million dollar payout. And if you vest them with discretion, they should be able to use it, right. There's the, it's, it's both in state court and federal court when they talk about the, and, and it's, it's used constantly. So I, I won't recall the specific case, but it is the, it's one of my favorite holdings that's consistently used is somebody who has a contractual, a hard-earned contractual right. And again, when sophisticated, there was no lack of leverage on either side here. They can never be multipled for exercising that right under the guise of a breach of the covenant of good faith and fair dealing. There was no, there was no reason for Mr. Carlins to think that he owed them anything and he terminated them before the deal closed. He should, it could, it could easily be affirmed on those grounds. I, I was, I was shocked that Judge Brennan very graciously didn't grant my 2619 motion because. Is it, I'm sorry, is it Judge Brennan or Mary Roberts? I'm sorry. Mary Roberts. Mary Roberts. Mary Roberts. I apologize. I had mediation with Judge Brennan. Why wasn't 2619 the appropriate way to go? It did. I filed the first one under 2619. She declined and they didn't respond. She could have easily, she could have not given them the right to reclaim. When she said I'm going to decline, I respectfully, I disagreed, but I attacked them because of what they pled. I only pled on 2615. I didn't need to revisit those arguments. They said we didn't have to do anything. That's what their complaint said. We didn't have to do anything. It's Chinese custom. They've now abandoned that. Thank you for getting him to, they've now abandoned that. So it's now just about, you know, you can talk about what the contract, what I thought, what I wanted, what I expected. That's not relevant. This is a contract case. You look at, you measure parties' intention by the words that they used in their agreement. You give them the plain language, and if the plain language says what it says, that's it. That's this case. Objective manifestations of intent. The words are clear. They didn't fulfill their duties. They don't get paid. Some, I'm sorry, dismissal with prejudice should be affirmed. Any other questions? I don't have anything. Thank you. Thank you. Rebuttal. Counsel didn't really give a reason why being on standby doesn't constitute assistance. There's lots of circumstances where it's obvious that this is the case. Perhaps the most glaring would be the fire department, right? We all hope to never actually need hands-on assistance from the fire department. We hope to never be in a building that catches on fire. We hope to never be in, there are other circumstances, of course, chemical spills. I guess in popular culture, there's the cat caught in the tree, right? But we all hope to never need assistance from the fire department, yet we all benefit from the existence of the fire department in case there is a fire. And once upon a time, before the government in the 19th century, before the government took on the responsibilities of fire department, it was insurance companies who took on the responsibilities of fire department. In fact, if one goes around the central parts of the city of Chicago, you can see very old fire stations that still refer to them as being the private insurance. And being on standby in case one is needed is a form of value. It is a form of assistance. Counsel says, talks a lot about Chinese custom. We didn't mention Chinese custom in either of our appellate briefs. We did plead a sentence about it in the complaint. It may have been alluded to in the trial court. We're not relying upon that. Counsel also talks about real estate brokers. He says, well, real estate brokerage contracts could say this, or they could say that, or they do say this, or they do say that. Those arguments weren't in his brief, and they're not found in the case, in the brokerage case law. This is no different from an exclusive brokerage agreement. But the thing I want to finish with is the notion that counsel says, well, I don't bill my clients for familiarizing myself about the law, or I don't bill my clients about familiarizing myself about the news or developments in society that might affect my law practice, or whatever he and his firm do other than defend this case. But this wasn't an hourly engagement. This was not an engagement where anyone was expecting to be given a bill detailing the services rendered. As we pointed out in our reply brief, Magellan couldn't bargain to pay Barrows a fixed monthly or one-time flat fee, just like rent, or rent to the parking space, or Internet access, or retainer. And if it had, it could hardly complain that Barrows didn't earn that fee because Magellan didn't call upon Barrows for advice. So here, the access is contingent. In order to make the access valuable, Barrows had to continually apprise itself of what was going on, what was going on with the parties, what was going on in society. So if counsel or counsel's firm were to shift to a purely contingent model like Barrows uses, then apprising himself of the law would be something that could be, you know, for internal accounting purposes or whatever, attached to a particular case. But that's not what happened here. There's a contingency, and the contingency is demonstrating where the discount took place. This is a 6-1-5 motion, and there will be a time for us to try and demonstrate that the contingency came to pass upon the man. Perhaps we can do it at trial or summary judgment, and perhaps we can't. But we should not have been dismissed on 6-15 grounds because we didn't allege that we provided particular services or that we had a seat at the table during the final negotiations or anything like that. Magellan didn't ask us to have a seat at the table, and they didn't call upon us to participate in the final negotiations. And those were their choices. But those choices are no different from somebody's choice not to use their office because they've gotten accustomed to working remotely as a result of Zoom and the coronavirus and so forth. They still have a contractual obligation to pay rent. And here, having, you know, this stuff about the kickbacks and everything, if they can prove any of that, you know, they can plead it as a defense. They can perhaps make equitable arguments at trial based on that. But all you have now is the allegation that we signed a contract with them. We fully performed. The contingency came to pass. They refused to pay us. That states a claim for breach of contract. The decision below dismissing the complaint under 6-15 should be reversed, and the case should be remanded so that they can answer the amended complaint. They can bring up any of this other stuff they want in their answer or in affirmative defense. Thank you. And I want to thank counsels for a very interesting case. Well argued, and we'll take this matter under advisement, and we'll take a short recess so the next case can be brought up.